1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANNA MARIE PHILLIPS, | ) | 1:11-cv-01928 GSA |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S** |
| | ) | **SOCIAL SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## **BACKGROUND**

Plaintiff Anna Marie Phillips ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability income benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Gary S. Austin.[1]

//

//

_____

[1]The parties consented to the jurisdiction of a United States Magistrate Judge.  (*See* Docs. 9 & 10.)

1

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for benefits in July 2005, alleging disability as of January 1, 2003.  AR 133-139.  Plaintiff's application was denied initially and on reconsideration; she then requested a hearing before an Administrative Law Judge ("ALJ").  AR 92-7.  ALJ David Marcus held hearings in May and October 2009, and subsequently issued an order denying benefits on December 15, 2009, finding Plaintiff was not disabled.  AR 17-26.  On September 21, 2011, the Appeals Council denied review.  AR 1-3.

### Hearing Testimony

#### *May 2009*

ALJ Marcus held a hearing on May 26, 2009, in Downey, California.  Plaintiff appeared and testified; she was assisted by attorney Lawrence Rohlfing.  Vocational Expert ("VE") Frank Corso also testified.  AR 30-61.

Plaintiff lives in a home with her boyfriend Chris.  He works outside the home, and so she is home alone during the day.  AR 37-38.  She reads and rests.  She is able to cook, but does not do so every day.  Further, Plaintiff indicated that her meal preparation was akin to "heat and eat" versus actual cooking.  AR 38.  She will occasionally iron.  AR 38.  Plaintiff does not vacuum, mop, sweep or do laundry.  AR 39.  She cannot bend or stoop because it pulls on her back too severely; she uses a back brace everyday.  AR 38-39.  After initially indicating she did not do anything outside the home, Plaintiff indicated she will occasionally use the hose or water plants.  AR 39.

Plaintiff last worked August 30, 2008, providing in home care services to senior citizens, having commenced that type of work in 2007.  She stopped working in that capacity because it became too difficult for her to bear the weight of assisting the individuals in and out of vehicles.  Additionally, the gentleman she worked for passed away on that date.  AR 35.  Other job duties

---

[2]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

of an in home care provider included dispensing medication and driving.  AR 35.  She tried not to lift more than ten pounds during the course of the position.  AR 35.  The working hours varied and typically involved working a three to four hour day; she did not work any eight-hour days as an in home care provider.  AR 48.  Additionally, she typically worked three or four days a week. AR 49.

In 2005, Plaintiff also worked as in home care provider, and prior to that she worked for a security company, dispatching the guards and preparing paperwork.  AR 36.  Years ago Plaintiff suffered a back injury while working in the construction field.  AR 36.

When she was asked why she could not perform the work of a dispatcher today, Plaintiff indicated that when she held the position, she and her ex-husband owned the company.  Plaintiff had the ability to lie down during the workday if necessary, and would also delegate duties to field supervisors or her older children.  AR 37.  She could not perform that type of work now due to the medications she takes to treat her condition; she stated she could not "function properly."  AR 37.  More specifically, she is on a number of prescription medications, including morphine.  She began taking morphine after July 2008 and has attended pain management at Kaiser.  AR 43.  She did not find pain management to be effective.  AR 43-44. The side effects of the medications she takes include sleepiness and fuzziness.  AR 44.  Her level of alertness is affected because she cannot remember what she had read nor can she retain information.  AR 44-45.  Relatedly, when she indicated earlier that she read while at home during the day, she typically reads her bible, starting "anywhere" and then reading until she falls asleep. AR 45.

When asked how far she could walk, Plaintiff responded that she thought she could walk several blocks.  AR 39.  She can stand in one spot for an hour or two.  AR 40.  After either walking the equivalent of a couple blocks or standing in place for an hour or two, Plaintiff would need to lie down for three or four hours, with her knees up on a pillow.  AR 40.  In a typical day, Plaintiff lies down with her knees up for about five hours total.  AR 40.  She could sit in a chair

3

for about an hour or an hour and a half if she sits on the chair's edge.  AR 40-41.  Plaintiff rests her forearms on the table in front of her when she is seated in order to take pressure off of her back and to protect herself.  AR 41.

Plaintiff estimated the heaviest weight she could lift is equivalent to a gallon of milk.  AR 42.  When she picks up around the house, she is unable to bend over to pick the item up; rather, she uses her "feet in a curtsy type of position" to "go straight down, grab [the item] and come straight back up."  AR 42.  She does not bend over, forward or backward.  AR 42.  Doing so will cause her to throw her back.  AR 42.  Plaintiff can no longer exercise or work out, fish, or work with non-profits to solicit donations.  AR 45.  Four or five years ago, Plaintiff worked out with free weights.  AR 46.

When asked to consider a typical day, not her best day or her worst day, Plaintiff estimated she could be active both physically and mentally for about four hours.  AR 46.

Plaintiff feels pain in the lower back, going down her left leg and into her calf.  The pain also wraps around her pelvis.  AR 47.  When asked how often that occurs, Plaintiff indicated that it happens in the middle of the night often, but then said it happens when she is "up moving around."  AR 47-48.  This type of pain is precipitated by leaning over, and sweeping or mopping.  AR 48.  Plaintiff uses a TENS[3] unit and ice packs to treat her back pain.  She uses the TENS unit about three or four times a week, and ice packs about every other day.  AR 49.

She has not had a surgical consultation at Kaiser, and it is her understanding that her doctors have tried everything to treat her pain.  AR 46-47.  Plaintiff understands her medical condition to be spinal stenosis in the lower back with arthritis and scoliosis, and noted the "majority of [her] discs are either bulged or herniated."  AR 47.

VE Corso described Plaintiff's past work as a companion, light and semi-skilled, with an SVP[4] of three, DOT 309.677-010; teacher's aide, light and semi-skilled with an SVP of three,

---

[3]A TENS unit refers to a Transcutaneous Electrical Nerve Stimulator.

[4]"SVP" refers to the Specific Vocational Preparation.

1   DOT 249.367-074; and security guard dispatcher, light and skilled, with an SVP of six, DOT

2   372.167-010.  AR 52.  As a result of the dispatcher position, Plaintiff attained transferable skills

3   including the ability to obtain and relay information, record keeping and office skills.  AR 52-53.

4   Those skills would transfer to sedentary jobs such as taxi cab starter, receptionist, and customer

5   service representative.  AR 53.  Significant numbers of those positions exist in the economy.  For

6   example, a receptionist position is sedentary, semi-skilled with an SVP of four, DOT 237.367-

7   038.  There are 623,000 positions available nationally, and 29,000 positions available in the Los

8   Angeles/Santa Ana/Long Beach area.  AR 53.  Additionally, a taxi cab starter is a sedentary,

9   semi-skilled position with an SVP of three, DOT 913.367-010.  There are 79,000 such positions

10  available nationally, and 3,500 positions in the local area. AR 53.

11        In a hypothetical question posed by the ALJ, the VE was asked to assume a hypothetical

12  person of the same age, education, language and work experience, who had the residual

13  functional capacity ("RFC") to lift and carry fifty pounds occasionally and twenty-five pounds

14  frequently, with the ability to stand and walk or sit for six hours in an eight-hour day.  AR 53-54.

15  VE Corso indicated that such an individual could perform all three of the positions previously

16  identified.  AR 54.

17        In a second hypothetical, the VE was asked to consider the same individual, with the

18  following RFC: the ability to lift and carry ten pounds occasionally and five pounds frequently, to

19  stand and walk for four hours in an eight-hour day and no more than two hours at a time with the

20  opportunity to be seated for up to fifteen minutes at a time, to sit for four hours in an eight-hour

21  day and no longer than an hour and a half at a time without the opportunity to stand for up to

22  fifteen minutes at a time to change positions, and only occasional stooping, kneeling, crouching

23  and crawling.  AR 54.  VE Corso indicated the individual could not perform Plaintiff's past

24  work.  AR 54.  Nevertheless, the VE indicated that such an individual could perform a limited

25  range of light work, including the following: cashier II, light and unskilled with an SVP of two,

26  DOT 211.462-010, with 1,021,000 such positions available nationally and 44,000 positions

27

28                                                5

available locally.  AR 54-55.  The individual could also perform the work of a counter clerk,
light and unskilled with an SVP of two, DOT 249.366-010, with 59,000 positions available
nationally and 2,100 positions locally.  AR 55.  The foregoing figures would then be eroded by
twenty-five percent to allow for the lifting requirement, and further eroded by an additional
twenty-five percent to accommodate the sit-stand option, for an overall fifty percent erosion.  AR
55.

In a third hypothetical, the VE was asked to consider the same individual, with the ability
to work five hours a day, secondary to a reaction to medication and the need to lie down.  VE
Corso indicated that such an individual would be unable to perform any work.  AR 56.

In response to an inquiry posed by Plaintiff's attorney about whether an individual who
was limited to simple one and two step instructions could perform the occupations identified, VE
Corso indicated that such an individual could perform some work but "not in numbers sufficient
for employability."  AR 58.

### October 2009

ALJ Marcus held a second hearing on October 13, 2009, in Downey, California.  Plaintiff
appeared and was assisted by Mr. Rohlfing.  Medical Expert ("ME") William Temple testified
and VE Randi Langford-Hetrick was present yet did not testify.  AR 62-85.

ME Temple testified that he had reviewed the entire medical record provided.  AR 65.
The ME indicated that an x-ray in June 2008 revealed mild scoliosis extending from T-9 through
L4, convex to the right at twenty-five degrees.  The x-ray also revealed mild degenerative disc
disease at L2-3 and L4 through S1.  AR 66-67.  ME Temple indicated that a twenty-five degree
curve is neither significant nor severe, and therefore would cause little impairment.  AR 67.

The MRI studies of November 2004 do not mention scoliosis, but indicate disc bulges at
L3-4 and L4-5 with a moderate degree of spinal stenosis, and the previously noted degenerative
disc disease.  AR 68.  The doctor indicated that stenosis has to be quite significant in order to
cause symptoms, the most common of which is pain with ambulation.  ME Temple noted that

there is nothing in the record to indicate Plaintiff suffers pain with ambulation; rather, most of Plaintiff's complaints relate to chronic back pain.  AR 68.  Further, a September 2007 MRI study was unremarkable; it did not mention scoliosis either.  AR 68.  It does note "some degree" of degenerative disc disease at L2-3, L4-5 and L5-S1.  AR 68.  With specific regard to the report's findings of "degenerative end plate changes," ME Temple explained that this notation signifies narrowing of the disc space with some compensatory or "arthritic lipping."  AR 68-69.  Additionally, the report's reference to a "broad based disc bulge described at L4-L5 causing mild bilateral neural foraminal narrowing," is not significant.  It does not involve nerve compression; that would be significant.  AR 69.

With regard to the orthopedic consultative examination report, ME Temple explained that "small anterolateral osteophytes at L5 and L3" refers to some narrowing of the disc space and arthritic changes.  It may cause discomfort in the back, but it is not serious.  AR 70.

ME Temple noted that six neurological examination resulted in normal findings regarding the lower extremities; motor function was normal as well.  Two examiners noted some muscle weakness in the lower extremities and feet, yet did not quantify or otherwise characterize the weakness.  In four examinations, straight leg raising was negative; two examinations revealed no atrophy.  These findings suggest no significant root compression.  Notably too, where the range of motion varied widely between examiners, those noting a limited range of motion did not qualify the limitation.  Most examiners found Plaintiff's gait to be normal, whereas two noted it was antalgic.  AR 71-72.

Next, ME Temple testified as follows:

> [ME Temple]: Now I know, Your Honor, that at least in the records that I was able to review there's no claim of a psychological or psychiatric problem and certainly it's not my job to comment on that but I might note that this lady on innumerable - - in numerable records is always presenting - - requesting pain medication.  A fairly classic narcotics dependent behavior.
> One doctor notes that she's on chronic narcotics.  One that she keeps demanding opiates.  Another one she came in to get pain medication because her pain medication was stolen.  That's one comment that's very often seen in somebody who's seeking narcotics.  Other times they'll state the dog ate them or they fell down the toilet and so forth and so on.

7

1

2

So it's something to be considered in considering the degree of her complaints of pain and how legitimate they are referenced to the objective data in the record, Your Honor.

3  AR 72.

4    ME Temple opined that Plaintiff did not suffer from an impairment or combination of

5  impairments that met or equaled a listed impairment. AR 72. Further, with regard to exertional

6  limitations, the ME opined Plaintiff could lift ten pounds frequently and twenty pounds

7  occasionally, could stand and walk six hours in an eight-hour day and sit for six hours in an

8  eight-hour day. With regard to postural limitations, the ME opined that Plaintiff was not limited

9  with regard to the use of ramps or stairs or the ability to kneel or crouch; she could occasionally

10  bend, stoop and crawl. AR 73. Plaintiff was to avoid vibration as an environmental limitation as

11  vibration could worsen the arthritis in her spine and cause pain. The doctor identified no

12  manipulative or communicative limitations. AR 73.

13    When questioned by Plaintiff's counsel, ME Temple agreed that pain is variable and that

14  Plaintiff is in pain management. AR 74. The ME did note that he believed Plaintiff's subjective

15  complaints were in excess of what one would expect given the objective data. AR 74-75. ME

16  Temple testified that both Norco and morphine are used to treat severe pain, and that Plaintiff

17  "may have developed an accommodation to her pain medications because she's been taking it for

18  so long." AR 75.

19    When asked to assume that Plaintiff's physicians had properly prescribed Norco and

20  morphine and other prescription medications, and whether he would expect an individual on

21  those medications to have the capacity to perform the full range of light work, ME Temple

22  indicated he would not. Instead, he would expect that individual to have a lesser degree of

23  function, perhaps at the sedentary level. AR 76. The ME indicated there may be side effects of

24  the medications prescribed to Plaintiff; sleepiness and dry mouth are two such side effects. AR

25  77-78.

26

27

28

ME Temple indicated that while it is reasonable for a person with Plaintiff's arthritic condition to complain of an inability to sit for thirty minutes, the less active a person is the more stiffness an individual will feel.  Therefore, persons suffering from arthritis should remain active. AR 78.

The ME indicated that patients suffering from a similar arthritic condition can vary widely in an ability to lift weight; some may be able to lift as little as five to ten pounds whereas others with the same condition may be able to lift fifty to one hundred pounds.  AR 79.

With regard to Plaintiff's earlier testimony that she is unable to bend, stoop or twist in any way, ME Temple indicated that Plaintiff shouldn't have much limitation in this regard, but did agree the condition could wax and wane.  AR 80.  The doctor indicated one would expect a greater degree of discomfort in an individual with this condition following sleep or lack of movement, and less discomfort when the individual is engaging in activity.  AR 80.

ME Temple opined that, based upon his review of the medical record, surgical intervention would be inappropriate in Plaintiff's case.  AR 81-82.

**Medical Record**

The entire medical record was reviewed by the Court.  AR 197-458.  The medical evidence will be referenced below as necessary to this Court's decision.

**ALJ's Findings**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 17-26.

More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2003.  AR 19.  Further, the ALJ identified lumbar scoliosis and lumbar degenerative disc disease as severe impairments.  AR 19.  Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments or combination of impairments did not meet or exceed any of the listed impairments.  AR 19.

The ALJ then determined that, based upon all impairments, including a substance use disorder, Plaintiff has the RFC to:  lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for five hours in an eight-hour workday, and sit for five hours in an eight-hour workday; occasionally climb ladders or scaffolds; and occasionally bend, stoop and crawl.  Plaintiff was precluded from exposure to vibrations, and secondary to the side effects of pain medication, was also precluded from working more than five hours a day.  AR 20.

Next, considering substance use, the ALJ determined that Plaintiff was not capable of performing her past relevant work.  AR 20.  Further, considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform.  AR 21-22.  Thus, considering substance use, the ALJ determined that Plaintiff was disabled.

Following the aforementioned finding, the ALJ then considered Plaintiff's ability to work were she to stop the substance use, in light of the same severe impairments identified above.  AR 22.  More particularly, in the absence of substance use, the ALJ determined that Plaintiff had the RFC to: lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday; occasionally climb ladders and scaffolds; and occasionally bend, stoop and crawl.  She was precluded from exposure to vibrations.  AR 22-25.

If Plaintiff were to stop substance use, the ALJ found that she could perform all past relevant work, both as actually and generally performed at the light exertional level. Additionally, the ALJ determined Plaintiff had acquired transferable skills, and therefore could perform the full range of sedentary work, including for example, the work of a receptionist or taxicab starter.  AR 25.  Thus, the ALJ ultimately determined that Plaintiff was not disabled.  AR 25-26.

1

## SCOPE OF REVIEW

2       Congress has provided a limited scope of judicial review of the Commissioner's decision

3  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

4  this Court must determine whether the decision of the Commissioner is supported by substantial

5  evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

6  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

7  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

8  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

9  401.  The record as a whole must be considered, weighing both the evidence that supports and

10 the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

11 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

12 apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

13 This Court must uphold the Commissioner's determination that the claimant is not disabled if the

14 Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

15 substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

16 Cir. 1987).

17

## REVIEW

18       In order to qualify for benefits, a claimant must establish that he is unable to engage in

19 substantial gainful activity due to a medically determinable physical or mental impairment which

20 has lasted or can be expected to last for a continuous period of not less than twelve months.  42

21 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

22 such severity that he is not only unable to do her previous work, but cannot, considering his age,

23 education, and work experience, engage in any other kind of substantial gainful work which

24 exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

25 The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

26 Cir. 1990).

27

28                                                    11

1    Here, Plaintiff argues that the ALJ erred by (1) performing a drug addiction analysis

2    where she takes prescription medication; (2) rebutting a treating physician's opinions improperly;

3    and (3) failing to provide substantial reasons for rejecting her testimony.  (Doc. 16 at 13-22 &

4    Doc. 20 at 3-8.)

5                                              **DISCUSSION**

6          ***The ALJ's Findings Regarding Substance Abuse***

7          Plaintiff contends the ALJ erred by denying benefits on the basis of a drug addiction

8    analysis involving prescription medications.  Plaintiff further contends the record "does not

9    reflect a pattern of drug use or the pursuit of drugs beyond the prescribed."  (Doc. 16 at 14.)

10   Plaintiff asserts the "statutory and regulatory framework use[s] 'addiction' outside the boundaries

11   of 'prescription.'" (Doc. 16 at 15.)  On the other hand, the Commissioner contends the record

12   contains substantial evidence of an abuse of pain medications and thus the ALJ's analysis must

13   be upheld.  (Doc. 19 at 7-8.)

14         Title 42 of the United States Code section 423(d)(2)(C) provides that "[a]n individual

15   shall not be considered to be disabled for purposes of [benefits under Title II or XVI of the Act]

16   if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's

17   determination that the individual is disabled."  *See Sousa v. Callahan*, 143 F.3d 1240, 1242 (9th

18   Cir. 1998).  Additionally, the Commissioner's regulations provide as follows: "If we find that

19   you are disabled and have medical evidence of your drug addiction or alcoholism, we must

20   determine whether your drug addiction or alcoholism is a contributing factor to the determination

21   of disability."  20 C.F.R. §§ 404.1535(a) & 416.935(a); *see also Bustamante v. Massanari*, 262

22   F.3d 949, 954 (9th Cir. 2001).

23         An ALJ must "first conduct the five-step inquiry without separating out the impact of

24   alcoholism or drug addiction."  *Bustamante*, 262 F.3d at 955.  "If the ALJ finds that the claimant

25   is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is

26   no need to proceed with the analysis."  *Id*.  However, "[i]f the ALJ finds that the claimant is

27

28                                                  12

1  disabled and there is medical evidence of his or her drug addiction or alcoholism, then the ALJ

2  should to determine if the claimant would still be found disabled if he or she stopped using

3  alcohol or drugs." *Id.* (internal brackets, quotation marks & citation omitted).

4      The "claimant bears the burden of proving that drug or alcohol addiction is not a

5  contributing factor material to his [or her] disability." *Parra v. Astrue*, 481 F.3d 742, 748 (9th

6  Cir. 2007), cert. denied, 552 U.S. 1141, 128 S.Ct. 1068, 169 L.Ed.2d 808 (2008).

7      Preliminarily, Plaintiff seems to argue that because the drugs involved here are

8  prescription drugs, the ALJ's analysis is improper on that basis.  However, Plaintiff has provided

9  no legal authority in support of her assertion.  Moreover, the relevant statutory and regulatory

10  language makes no distinction between prescription drug use and illegal drug use.  If the

11  Legislature would have intended for prescription and illicit drugs to be treated differently, this

12  Court believes it would have made that distinction know.  Recently, in the United States District

13  Court in Idaho, the court upheld an ALJ's analysis where the drug use in question involved

14  prescription medications. *See Sheridan v. Astrue*, 2010 WL 3893973 *2 (D. Idaho Sept. 30,

15  2010).  Other courts, both within this circuit and elsewhere, have also determined that

16  prescription drugs are properly considered in the drug addiction analysis. *See, e.g., Bowers v.*

17  *Astrue*, 2010 WL 2723220 (D. Or. May 28, 2010) (remanding for ALJ to consider claimant's

18  prescription drug addiction); *Krowiorz v. Barnhart*, 2005 WL 715930 (N.D. Iowa Mar. 30, 2005)

19  (remand to determine whether claimant's addiction to prescription medications is a contributing

20  factor); *Dailey v. Astrue*, 2010 WL 4703599 (W.D.N.Y. Oct. 26, 2010 ) (prescribed medication

21  not precluded from being assessed for materiality under § 416.935 & citing to Ohio authority for

22  same).  Therefore, to the degree Plaintiff argues prescription medication use does not trigger an

23  addiction analysis, she is mistaken.

24      Next, Plaintiff argues the record does not reflect a pattern of drug abuse or the pursuit of

25  drugs beyond that which is prescribed.  More specifically, she contends that the reference by the

26  ALJ and Dr. Temple to a single episode of a nephew stealing Ms. Phillips's Norco is insufficient.

27

28

Again, Plaintiff is mistaken. This Court's careful and thorough review of the medical record reveals a number of references in addition to the aforementioned, to wit: Plaintiff stated she lost the medication (AR 304 [5/22/06]); her nephew stole her medication (AR 303 [8/1/06]); her Norco was stolen (AR 376 [11/29/07]); and she "ran out" of morphine early because her father-in-law died and it caused her to be more active (AR 429 [10/7/08]).  Moreover, the Court notes that this record contains numerous references, as far back as 2004, wherein various treatment providers referenced Plaintiff's need for a pain management program and a need to decrease her use of various prescribed narcotics.  *See, e.g.* AR 223-224, 232-233, 250, 289, 297, 300, 439.

The ALJ's drug addiction analysis was required and proper, and Plaintiff did not meet her burden of proving that drug addiction is not a contributing factor material to her disability. Given this record, this Court finds ALJ Marcus' findings are supported by substantial evidence and are free of legal error.

### The ALJ's Findings Regarding Dr. Dumitru's Opinion

Plaintiff argues that the ALJ erred with regard to his assessment of the opinions offered by Dana Dumitru, D.O., and more specifically, regarding Plaintiff's ability to lift and carry, and to sit, stand and walk during an eight-hour workday.  (Doc. 16 at 16-18.)  The Commissioner contends however that the ALJ properly evaluated the medical evidence and gave specific and legitimate reasons for rejecting the doctor's November 2009 opinion.  (Doc. 19 at 8-10.)

### 1.    *The Legal Standards*

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another

doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the

opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990);

*Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating

physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506. And like the opinion

of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

can only be rejected for specific and legitimate reasons that are supported by substantial evidence

in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence

that justifies the rejection of the opinion of either an examining physician or a treating physician.

*Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456.  In some cases, however, the ALJ can

reject the opinion of a treating or examining physician, based in part on the testimony of a

nonexamining medical advisor.  *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.

1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995).  For example,

in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician,

"the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of

Magallanes's treating physicians . . .."  *Magallanes*, 881 F.2d at 752.  Rather, there was an

abundance of evidence that supported the ALJ's decision:  the ALJ also relied on laboratory test

results, on contrary reports from examining physicians, and on testimony from the claimant that

conflicted with her treating physician's opinion.  *Id*. at 751-52.

15

1

### 2.    *The ALJ's Findings*

2    ALJ Marcus' relevant findings provide as follows:

3        The undersigned does not give great weight to the opinion of treating
osteopath Dana Dumitru, D.O. finding that the claimant cannot sit more than 3
4    hours, stand more than 2 hours, walk more than 1 hour, and never lift or carry any
weight.  Dr. Dumitru's opinion is not supported by the record, even with the
5    claimant's substance abuse, and the opinion is contradicted by Dr. Temple's
opinion, the State Agency opinions, and the April 16, 2009 note from David A.
6    Sweeney, M.D. discussed further below.  Giving the claimant the benefit of the
doubt, however, the undersigned adopts the lifting capacity described by Dr.
7    Temple but further limit[s] her standing/walking functions.

8    AR 20, internal citations omitted.

9                    ### 3.    *Dana Dumitru, D.O.*

10        On November 18, 2009, Dana Dumitru, D.O., completed a Residual Functional Capacity

11   Questionnaire form.  The doctor opined that Plaintiff could sit for three hours, stand for two

12   hours and walk for one hour at any one time.  The doctor also found Plaintiff could sit for a total

13   of three hours total during an eight-hour workday, stand for a total of two hours during an eight-

14   hour workday, and walk for a total of one hour in an eight-hour workday.  In combination,

15   Plaintiff could sit, stand and walk no more than three hours in an eight-hour workday.  AR 448.

16   Dr. Dumitru found Plaintiff could occasionally lift and carry up to twenty pounds, but could

17   never lift any weight over twenty-one pounds.  AR 448.  Plaintiff was capable of grasping,

18   pushing and pulling, and fine manipulation.  AR 448.  She could also use her feet for repetitive

19   foot control movements.  AR 449.  Plaintiff could occasionally squat, crawl, climb, reach, crouch

20   and kneel, but could never bend or stoop.  AR 448.  With regard to environment, Plaintiff could

21   frequently be exposed to noise and could occasionally tolerate exposure to moving machinery

22   and dust, fumes and gases.  However, she could never tolerate exposure to unprotected heights,

23   marked temperature changes, or driving automotive equipment.  AR 449.  Dr. Dumitru identified

24   x-ray and muscle spasm as the objective signs of Plaintiff's severe pain.  AR 449.

25

26

27

28                    16

### 4.   *Analysis*

Here, Dr. Dumitru's opinion as a treating physician is contradicted by the opinions of ME Temple, an examining physician, and the State Agency physicians.  As a result of the contradiction, the ALJ was required to give specific and legitimate reasons supported by substantial evidence.  The ALJ offered specific and legitimate reasons for affording the doctor's opinion little weight.

ME Temple opined that Plaintiff was capable of standing or walking for six hours in an eight-hour day, and sitting for six hours in an eight-hour day.  He further found Plaintiff was capable of lifting and carrying ten pounds frequently and twenty pounds occasionally.  AR 72-73.  ALJ Marcus afforded the ME's opinion the greatest weight for the doctor is a board certified orthopedic surgeon who reviewed the entire medical record, as well as Plaintiff's testimony.  Further ME Temple's opinion was consistent with the record as a whole.  AR 24-25.

Board certified orthopedic examiner Bunari T. Sophon, M.D., determined that Plaintiff was capable of standing, walking and sitting for six hours in an eight-hour day, and was capable of lifting twenty-five pounds frequently and fifty pounds occasionally.  AR 321.  A State Agency Physical Residual Functional Capacity Assessment, completed by Imelda A. Aguilar-Fuentes, similarly found Plaintiff was capable of standing, walking and sitting for six hours in an eight-hour day, and lifting and carrying twenty-five pounds frequently and fifty pounds occasionally.  AR 323-328.  The ALJ gave these two opinions lesser weight than that afforded to ME Temple because Dr. Sophon's opinion did not evaluate Plaintiff's limitations with substance abuse and the State Agency findings were not completed by an acceptable medical source.  AR 20.

In any event, the RFC differs significantly regarding Plaintiff's ability to sit, stand and walk during a workday.  Nevertheless, the medical record simply does not endorse the restrictive limitations identified by Dr. Dumitru.  Accordingly, ALJ Marcus' findings that Dr. Dumitru's opinion was not supported by the medical record and was contradicted by other medical opinions are supported by substantial evidence and are free of legal error.

*The ALJ's Credibility Findings*

Plaintiff contends the ALJ erred in assessing her testimony. (Doc. 16 at 18-22.) In response, the Commissioner asserts the ALJ provided legitimate reasons for finding Plaintiff's subjective symptom testimony less than fully credible. (Doc. 19 at 10-11.)

### 1.   *The Legal Standards*

A two step analysis applies at the administrative level when considering a claimant's credibility. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id.* at 1281-1282. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so. *Id.* at 1281. The ALJ must "state which testimony is not credible and what evidence suggests the complaints are not credible." *Mersman v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D. Cal. 2001), quotations & citations omitted ("The lack of specific, clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence"); Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight").

An ALJ can consider many factors when assessing the claimant's credibility. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ can consider the claimant's reputation for truthfulness, prior inconsistent statements concerning his symptoms, other testimony by the claimant that appears less than candid, unexplained or inadequately explained failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily activities, claimant's work record, or the observations of treating and examining physicians. *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).

### 2. *Analysis*

The first step in assessing Plaintiff's subjective complaints is to determine whether Plaintiff's condition could reasonably be expected to produce the pain or other symptoms alleged. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Here, ALJ Marcus found that Plaintiff suffered from the severe impairments of lumbar scoliosis and lumbar degenerative disc disease.  AR 19.  Additionally, the ALJ found the "subjective evidence indicates that [Plaintiff] does experience pain that limits her functional limitations."  AR 22.  This finding satisfied step one of the credibility analysis.  *Smolen*, 80 F.3d at 1281-1282.

Because the ALJ did not find that Plaintiff was malingering, he was required to provide clear and convincing reasons for rejecting Plaintiff's testimony.  *Smolen*, 80 F.3d at 1283-1284; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (as amended). When there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of those symptoms solely because they are unsupported by medical evidence.  *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7.  Moreover, it is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell*, 947 F.2d at 345-346.

In this case, ALJ Marcus found as follows:

> The claimant states that she has taken strong medications - 4 Norco pills daily and 4 Soma - pills daily over 16 years.  The claimant also states that she uses a TENS ("Transcutaneous Electrical Nerve Stimulator") unit and ice packs, as well as takes hot baths and uses hot patches and ice packs to relieve pain. . . .
>
> The claimant also states that she needs assistance with carrying groceries and doing the following chores: mopping, vacuuming, cleaning showers, cleaning toilets, making beds, doing laundry, sweeping, and moving furniture.  The claimant's statements contradict her testimony at the May 2009 hearing, however, at which she indicated that she doesn't sweep and does not do housework, which tends to lessen her credibility.
>
> At the same time, the claimant also states that, even with pain, she still manages to: shop, raise a family, do laundry, drive her own car, sit with seniors and take them to the doctor, and take herself to the doctor.  At the May 2009 hearing, the claimant testified that she can lift a gallon of milk, which indicates some lifting and carrying ability.  While the claimant does not have to be utterly incapacitated in order to be found disabled, her activities of daily living are not

consistent with her allegations of disabling pain.

Further lessening the claimant's credibility is that she initially alleged that her pain caused her to be unable to work in 1997.  Although the claimant later changed her alleged onset date of disability to June 1, 2003, she nevertheless was still able to work at near-substantial gainful activity levels in 2005 and 2007, and she did not file this application until a few years after she alleges she became unable to work.

AR 22-23, internal citations omitted.

ALJ Marcus found Plaintiff to be less than credible because (1) she gave inconsistent testimony, (2) her activities of daily living are inconsistent with her allegations of pain, and (3) she worked after the alleged onset of disability in 2003, earning near substantial gainful activity levels in both 2005 and 2007.

Inconsistency is a proper credibility consideration.[5]  *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995).  A review of the Pain Questionnaire completed by Plaintiff on September 29, 2007, supports the ALJ's finding that Plaintiff contended she needed assistance with mopping, vacuuming, cleaning showers and toilets, making bed, sweeping, and laundry. *See* AR 173; *see also* AR 213 (mopping, vacuuming, sweeping, bending increase pain).  In May 2009 however, Plaintiff testified that she does not vacuum, mop, sweep or do laundry.  She indicated she occasionally ironed, and would heat and serve prepared meals every other day.  AR 38-39.

Also, an ALJ can look to daily living activities as part of the credibility analysis.  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.  *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  The ALJ must make "specific findings relating to [the daily] activities"

[5] The Court notes that despite an alleged disability onset date of January 1, 2003, the medical record reveals that Plaintiff was able to travel to and attend the Cannes Film Festival in October 2004.  See AR 247, 250, 252.

and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Orn v. Astrue*, 495 F.3d at 639.

Unlike the Ninth Circuit's finding in *Orn* where there was "neither evidence to support that [the claimant]'s activities were 'transferable' to a work setting nor proof that [the claimant] spent a 'substantial' part of his day engaged in transferable skills" (*Orn v. Astrue*, 495 F.3d at 639), here there is proof that Plaintiff spent a substantial part of her day engaged in transferable skills, including shopping, raising a family, driving a car, sitting with seniors, and taking them to appointments, after the alleged onset of disability in 2003.

With regard to the ALJ's consideration of the fact that Plaintiff had near-substantial gainful activity in 2005 and 2007 - two and four years after the 2003 onset of disability date - such consideration is not error. An ALJ can evaluate credibility using "ordinary techniques of credibility evaluation." *See Bunnell v. Sullivan*, 947 F.2d at 346-47; *see also Light v. Soc. Sec. Admin.*, 119 F.3d at 792. This Court finds that considering Plaintiff's earnings of $9,421.92 in 2005 and $10,639.66 in 2007 is an ordinary technique for evaluating a claimant's credibility.[6]

Ultimately, there is substantial evidence in this record to support the ALJ's conclusions regarding credibility, and even if one reason offered were error, reversal is not required. *See also Carmickle v. Commissioner of Social Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (*citing Batson v. Comm. of Soc. Sec. Admin.*, 359 F. 3d 1190, 1197 (9th Cir. 2004) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility'" and the error "does not negate the validity of the ALJ's ultimate [credibility] conclusion" such is deemed harmless and does not warrant reversal).

In sum, the ALJ's credibility findings are supported by substantial evidence and are free of legal error.

---

[6]Each sum earned by Plaintiff in those years was only a few hundred dollars shy of the presumptive threshold for a finding of substantial gainful activity. (*See* AR 19, 137.)

21

1

## <u>CONCLUSION</u>

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Anna Marie Phillips.


IT IS SO ORDERED.

**Dated:**   **November 19, 2012**              _____ **/s/ Gary S. Austin** _____
                                                   UNITED STATES MAGISTRATE JUDGE

22